NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

Hector Tavarez

                Plaintiff,

    v.

Township of Egg Harbor, et. al.,

              Defendants.

_____

:
:
:
:
:
:

Hon. Joseph H. Rodriguez

Civil Action No. 09-6119

**OPINION**

 

This case arises from Plaintiff Hector Tavarez's claims that Defendants' failure to promote him to Captain of Police in 2007, 2008, and 2009 constitutes racial discrimination in violation of federal and state law.  Defendants, the Township of Egg Harbor and the individual members of the Township Committee, have moved the Court for Summary Judgment pursuant to Fed. R. Civ. P. 56 [Dkt. 64].  For the reasons described herein, the Court will grant Defendants' Motion for Summary Judgment.

## I.    Facts and Procedural Background[1]

Hector Tavarez, a Hispanic male, was hired by the Egg Harbor Township Committee on August 25, 1985.  (Pl. Responsive Statement of Material Facts ("RSMF") ¶ 1)  When Tavarez was hired, he was the only Hispanic officer.  (Pl. Counterstatement of Material Facts ("CSMF") ¶ 2)  Tavarez rose through the ranks of the Egg Harbor Township Police

---

[1] The facts presented in this section are based on the admitted and undisputed facts in the record.  As the Court is reviewing Defendants' Motion for Summary Judgment, in its analysis, the Court has construed the facts and reasonable inferences arising from those facts in favor of Plaintiff, the non-movant.  See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Department, as he was promoted to Sergeant on October 13, 1999, Lieutenant on January 1, 2006, and Captain on January 1, 2011.  (Pl. RSMF ¶¶ 35, 36, 37)  In the year that Tavarez was promoted to Lieutenant, he was the only candidate to have passed the Lieutenant's exam without the use of a paid study program.  (Defs.' Resp. to Pl. CSMF ¶ 5)  Throughout his career, Tavarez worked in various areas of the agency, as he worked as a Patrol Officer, Community Policing Officer, Patrol as a Master Police Officer, Patrol as a Sergeant, and Detective Sergeant in the Defective Bureau and Juvenile and Community Services Unit; additionally, Tavarez created and / or served on various Units and Committees, including the Off Road Motorcycle Unit, the Agency Improvement Committee, the Gang Reduction Unit, and the Hostage / Crisis Negotiation Unit.  (Defs.' Resp. to Pl. CSMF ¶¶ 6-10)  Tavarez was also a DARE and Adopt-a-Cop Instructor as well as a co-founder and Executive Director of the Police Athletic League.  (Defs.' Resp. to Pl. CSMF ¶¶ 11-12)  Tavarez has been the recipient of several honors throughout his career, including being recommended for County Law Enforcement Officer of the Year, being nominated by former Mayor Burns as the National Police Athletic League Juvenile Crime Prevention Specialist of the Year, and receiving the Nuestro Pueblo award, which was given for "improving the quality of life in our community and advancing our cultural heritage."  (Pl. RSMF ¶¶ 46-50).

Tavarez first sought a Captain position in Egg Harbor Township in January 2007. (Defs.' Resp. to Pl. CSMF ¶ 22)  While the parties dispute the precise history and nature of the Township Committee's decision-making process, as will be discussed herein, it is undisputed that the Township used the same promotional process between 2007 and 2011.  (Pl. RSMF ¶ 85)  After Township Administrator Peter Miller and the Chief of Police announced the open Captain position, the candidates expressed their interest in

writing to the Chief of Police.  (Pl. RSMF ¶¶ 86-87)  The Chief determined and certified the eligible candidates for Captain and presented these candidates to the Township Committee with the candidates' resumes.  (Pl. RSMF ¶¶ 58, 60, 124)  In Egg Harbor Township, the Township Committee is vested with the supervision, regulation, and control of the Police Department, which includes the power and authority to appoint all officers, members, and employees of the Police Department, including the final decision on whom to promote to Captain in Egg Harbor Township.  (Pl. RSMF ¶¶ 55-56, 61)  The Township Committee involved in the disputed promotional rounds was comprised of Mayor James McCullough, Committee Member Stanley Glassey, Committee Member John Carman, Committee Member Paul Hodson, and Committee Member John Risely. (Defs.' Ex. 35, "Egg Harbor Township's Answers to Plaintiff's Initial Interrogatories").

For each of the promotional rounds at issue, the Township Committee scheduled a special meeting and convened into closed session to conduct oral interviews of the candidates.  (Pl. RSMF ¶¶ 88-90)  The Township Committee then interviewed the candidates using the same interview questions, which Township Administrator Peter Miller drafted for each promotion based on issues that the town confronted at the time. (Pl. RSMF ¶¶ 90-91)  Following the candidate interviews, the Committee members individually ranked the candidates and selected the candidate with the highest overall rank.  (Pl. RSMF ¶¶ 95-96)  The Chief of Police was then informed of the selected candidate, and either the Township Administrator or the Township Clerk drafted a resolution formally appointing the officer to the open Captain position.  (Pl. RSMF ¶ 97).

Tavarez sought a promotion from Lieutenant to Captain in 2007, 2008, 2009, and 2011.[2] (Pl. RSMF ¶¶ 99, 182, 225, 317)  The parties do not dispute that he was qualified to be Captain during each promotional round.  (Defs.' Mem. Supp. Summ. J. 6)  Tavarez did not receive a promotion in 2007, 2008, or 2009; rather, the Township promoted a Caucasian male after each promotional round at issue.  (Am. Compl.)  Tavarez claims that the Township failed to promote him during these rounds because of his Hispanic race.  (Am. Compl.)  Accordingly, he filed a Complaint on December 3, 2009, alleging violations of 42 U.S.C. § 1981, the New Jersey Law Against Discrimination, and the New Jersey Constitution.  (See Compl.)  The Complaint named as Defendants the Township of Egg Harbor as well as the individual members of the Township Committee:  James McCullough, Stanley Glassey, Paul Hodson, John Risely, Jr. and John Carman, Jr.[3]  (See Compl.)  On February 16, 2010, Defendants filed a Motion to Dismiss, which the Court granted with respect to the New Jersey Law Against Discrimination claim arising out of conduct that occurred in 2007, as the claim was barred by the statute of limitations; the Court allowed Tavarez to re-file an Amended Complaint, which was filed on July 15, 2010.  [Dkt. 28, 29, 30]  The Defendants answered the Amended Complaint on August

---

[2] The details of each of the contested promotional rounds are explained with greater specificity throughout the Court's analysis.  Tavarez received a promotion to Captain in 2011.  (Defs.' Ex. 71, "Resolution No. 4 Promotion Lieutenants Tavarez and Woods to Captains")  Tavarez retired in 2011.  (Defs.' Ex. 46, "Plaintiff Dep.," Tr. 143:1 – 146:15).

[3] Defendants point out that Plaintiff has failed to plead his 42 U.S.C. § 1983 claim against "all Defendants," which should preclude the Court from considering Plaintiff's municipal liability claim under § 1981.  (Defs.' Mem. Supp. Summ. J. 47)  Here, for the sake of efficiency and in the interest of justice, the Court will not require the parties to amend and refile their submissions, but will overlook the deficiency for the purpose of deciding Defendants' Motion.  See, e.g. Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").  Here, disregarding this defect will not prejudice either party, as Defendants were sufficiently on notice of Plaintiff's municipal liability claims, as evidenced by the briefing and submissions in defense of such a claim in this matter.

30, 2010 [Dkt. 32] and filed the present Motion for Summary Judgment on June 29, 2012. [Dkt. 64].

## II.   **Jurisdiction**

The Court has subject matter jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367.

## III.   **Defendants' Motion for Summary Judgment**

### a.  **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(c), a court shall grant summary judgment if, viewing the facts most favorable to the non-moving party, the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Cleotex Corp. V. Catrett, 477 U.S. 317, 322 (1986)); Fed. R. Civ. P. 56(c). An issue is "genuine" if it supported by evidence such that a reasonable jury could return a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.

### b.  Plaintiff's Race Discrimination Claims

The Amended Complaint sets forth a claim of race discrimination under 42 U.S.C. § 1983, alleging a violation of 42 U.S.C. § 1981.[4]  To be successful on such a claim under § 1981, a plaintiff must prove intentional discrimination.  See Chauhan v. M. Alfieri Co., Inc., 897 F.2d 123, 126 (3d Cir. 1990).  Because of "the evidentiary difficulties involved in proving discriminatory intent," the United States Court of Appeals for the Third Circuit has held "that summary judgment motions in Section 1981 cases are governed by the well-known burden shifting provisions laid down in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)" that are generally applied to Title VII claims.[5]  Id.  See also Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009) (noting that "the substantive elements of a claim under Section 1981 are generally identical to the elements of an employment discrimination claim under Title VII").

---

[4] Tavarez argues that his claims allege "employment discrimination on the basis of race or national origin."  (Pl. Br. Opp'n. 2)  However, he does not bring such a "national origin" claim in his Amended Complaint or advance any argument supporting the elements of a "national origin" claim in any supplemental filings.

[5] In addition to Plaintiff's claim under 42 U.S.C. § 1983, alleging a violation of 42 U.S.C. § 1981, Plaintiff also brings claims under the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et. seq. and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 et. seq.  In general, the standards that govern federal employment discrimination claims also govern analogous claims under New Jersey law.  See, e.g. Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 305 (3d Cir. 2004) (noting that "[i]n the absence of divergent language between the NJLAD and federal discrimination laws, the Supreme Court of New Jersey has applied federal standards in NJLAD cases in the interest of achieving a degree of uniformity in the discrimination laws") (internal quotation omitted)); Murphy v. Hous. Auth. & Urban Redevelopment Agency of City of Atl. City, 32 F. Supp. 2d 753, 763 (D.N.J. 1999) aff'd, 208 F.3d 206 (3d Cir. 2000) (noting that "the analytical framework, known as the shifting burden standard, developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to both Title VII and NJLAD claims for employment discrimination").  Accordingly, the Court's burden-shifting analysis described herein applies to both the federal and state law discrimination claims.

Under the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, the plaintiff carries the initial burden of establishing a prima facie case of unlawful discrimination.[6]  411 U.S. 792, 802.  If the plaintiff succeeds in meeting his or her initial burden, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."  <u>Fuentes</u>, 32 F.3d at 763.  At this stage, the defendant's burden is "light," as the defendant "satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision," but the defendant need not prove "that the tendered reason actually motivated its behavior."  <u>Id.</u>  Here, "the nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981).

As the United States Court of Appeals for the Third Circuit has noted, when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its decision, "the burden of production rebounds to the plaintiff, who must []

---

[6] Plaintiff must carry the initial burden of establishing a prima facie case of unlawful discrimination by showing:

> (1) the plaintiff belongs to a protected class; (2) he/she was qualified for the position; (3) he/she was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position.

<u>Sarullo v. U.S. Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973)).

show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32 F.3d at 763.  At this juncture, "[t]o defeat summary judgment . . .  the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Id. at 764.  In doing so, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531, 533 (3d. Cir. 1992); Villanueva v. Wellesley College, 930 F.2d 124, 131 (1st Cir. 1991)).  Rather, the non-moving plaintiff must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. (internal citations omitted).  Here, "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge," as the "question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (internal quotation omitted).[7]

---

[7] Plaintiff argues that he may establish "pretext" under either the burden-shifting standard or the "mixed motive" theory of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  However, a plaintiff may only use the "mixed motive" theory in non-Title VII cases when the plaintiff has "direct evidence" of discrimination.  See, e.g., Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267-68 (3d Cir. 2010) (noting that "the direct evidence test introduced by Price Waterhouse v.

Here, Defendants agree that Plaintiff has put forth a prima facie claim for failure to promote based on race for the 2007, 2008, and 2009 promotions at issue.  (Defs.' Mem. Supp. Summ. J. 5)  Specifically, Defendants agree that Plaintiff belongs to a protected class, as he is a Hispanic male, was qualified for the position of Captain but did not receive a promotion, and a Caucasian male was promoted to Captain in 2007, 2008, and 2009.  (Defs.' Mem. Supp. Summ. J. 6)  However, Defendants argue that they are entitled to an entry of Summary Judgment in their favor, as they have presented legitimate non-discriminatory reasons for Plaintiff's non-promotions and Plaintiff is unable to present any evidence of pretext underlying any of the promotions at issue. (Defs.' Mem. Supp. Summ. J. 6).

### i.  Defendants' Legitimate Non-Discriminatory Reasons

The parties agree that Tavarez has made a prima facie showing of discrimination in each of the 2007, 2008, and 2009 promotion decisions.  Accordingly, the burden shifts to Defendants to "articulate some legitimate, non-discriminatory reason for the employee's rejection."  Fuentes, 32 F.3d at 763 (internal quotation marks omitted). Here, during each of the 2007, 2008, and 2009 promotional decisions, the Township Committee was comprised of the same members:  John Risley, Mayor James McCullough, Stanley Glassey, John Carman, and Paul Hodson.  (Defs.' Ex. 35, "Egg Harbor Township's Answers to Plaintiff's Initial Interrogatories")  Defendants argue

---

Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-shifting framework introduced by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), may be used to determine whether an employer has discriminated against a plaintiff in violation of § 1981, and holding that these standards apply to lending discrimination claims brought under § 1981).  Here, Plaintiff admits that he does not have any direct evidence of discrimination.  (Defs.' Ex. 46, "Deposition of Plaintiff," Tr. 33:13 – 33:17, 78:5 – 78:8; Pl. RSMF ¶ 170 ("Admitted that plaintiff responded that he did not have facts, but it is evident from his other testimony that he was referring to direct evidence")).  Accordingly, the burden-shifting analysis as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to this case.

that they have presented sufficient legitimate, non-discriminatory reasons for each of the Township Committee's promotional decisions at issue in this case; specifically, over the course of the three promotional rounds, the Township Committee considered "the interview of the candidates, the recommendation of the Chief, their experience, longevity, education, and workplace background," which are "acceptable legitimate, non-discriminatory reasons to choose one candidate over another."  (Defs.' Reply 6).

### *The 2007 Promotion*

There were three open positions for Captain in 2007; the Chief recommended Michael Morris, Larry Szapor, and Tavarez for the promotion, but told the Township Committee that he would not recommend against Ted Kammer or Robert Fisher, because all five individuals were qualified for the position.  (Defs.' Ex. 31, "Deposition of Catania," Tr. 37:1 – 38:3, 33:1 – 33:20).  The Township Committee interviewed Kammer, Morris, Szapor, and Tavarez during a Closed Session meeting on December 21, 2006.[8]  (Defs.' Ex. 32, "EHT's Answers to Plaintiff's Third Supplemental Interrogatories")  The Township Committee promoted Kammer, Morris, and Szapor. (Defs.' Ex. 66, "Resolution No. 56 Promoting Lieutenants Szapor, Morris, & Kammer to Captain").

Defendants argue that the Township Committee did not find that Plaintiff was unqualified, but found that the other candidates were more qualified "based in their experience and interviews."  (Defs.' Mem. Supp. Summ. J. 11)  Here, Defendants point out that Plaintiff was the most junior Lieutenant of the four possible candidates.  (Defs.' Mem. Supp. Summ. J. 11; Pl. App. A1)  Defendants argue that the members of the

---

[8] It is undisputed that Robert Fisher declined to participate in the interview process. (Pl. RSMF ¶ 100).

Township Committee considered "[t]he interview of the candidates, the recommendation of the Chief, their experience, longevity, education, and workplace background" and that these are acceptable non-discriminatory reasons to choose one candidate over another.[9]

### The 2008 Promotion

There was one open position for Captain in 2008;[10] the Chief recommended Robert Fisher.  (Defs.' Ex. 31, "Catania Dep.," Tr. 34:3 – 35:3)  The Township Committee interviewed James Druding, William Fair, Robert Fisher, John Woods, and Tavarez during a Closed Session meeting on April 16, 2008.   (Defs.' Ex. 32, ""EHT's Answers to Plaintiff's Third Supplemental Interrogatories")  The Township Committee promoted

---

[9] McCullough and Glassey each ranked Tavarez third out of the four candidates, thereby recommending him for the promotion to one of the three open positions. (Defs.' Ex. 39, "2007 Tally Sheet of McCullough; Defs.' Ex. 40, "2007 Tally Sheet of Glassey")  Risley, Carman, and Hodson ranked Tavarez fourth.  (Defs.' Ex. 37, "Captain's Rankings for Risely"; Defs. Ex.43, "2007 Tally Sheet of Carman"; Defs. Ex. 45, "2007 Tally Sheet of Hodson")  Carman and Risley testified that they do not remember exactly why they ranked Tavarez last.  (Defs.' Ex. 42, "Carman Dep.," Tr. 20:13- 20:17; Defs.' Ex. 30, "Risley Dep.," Tr. 18:6-18:11)  Risley is "sure" that one of the factors in considering Tavarez was "longevity."  (Defs.' Ex. 30, "Risley Dep.," Tr. 20:14 – 21:5)  Carman said that he considered factors such as "their length of service" and "what they have done," but, to Carman, "the interview counted heavier than anything else because they all should have been qualified or they wouldn't have been there."  (Defs.' Ex. 42, "Carman Dep.," Tr. 21:20 – 21:22)  Hodson said that "when they enter the room, I listen to everything they say, I listen to how they answer the questions, I look at their bio, and I usually look at experience and skill, . . . how long they've been here, skill level, and positions held and stuff like that."  (Defs.' Ex. 44, "Hodson Dep.," Tr. 24:6 – 24:11).

[10] During a Township Committee meeting on May 30, 2007, the Chief announced that Captain Szapor might leave to join the Prosecutor's Office and therefore a Captain position would likely become available.  (Pl. RSMF ¶ 171-72)  The Committee considered promoting Tavarez without a further interview since they had recently conducted interviews for Captain.  (Pl. RSMF ¶ 171-72; Defs.' Ex. 47 "Meeting Minutes from the May 30, 2007 Meeting")  However, Defendants argue that because Captain Szapor did not leave until eleven months later, "the Committee felt that enough time had passed that they should interview."  (Defs.' Mem. Supp. Summ. J. 19)  Defendants argue that this decision should not be considered pretext because "there is no indication that the Township Committee decided to interview candidates in 2008 because of a discriminatory purpose against Plaintiff, but rather the evidence is that a substantial period of time had passed since the last interviews and "in the interest of fairness the Township Committee thought the proper thing to do would be to interview again."  (Defs.' Mem. Supp. Summ. J. 19).

Robert Fisher.  (Defs.' Ex. 67 "Resolution No. 202 Promoting Lieutenant Fisher to Captain").

Defendants argue that the Township Committee's "consensus following the 2008 interview process was that Fisher had a better interview than Plaintiff," as several Committeemen said that Plaintiff had an "attitude" during this interview.[11]  (Defs.' Mem. Supp. Summ. J. 17)  Defendants also point out that the Chief recommended Fisher for the one available Captain position.  (Defs.' Mem. Supp. Summ. J. 17)  Here, Chief Catania testified that he initially recommended Tavarez over Fisher in 2007, as the Chief was concerned that Fisher would not meet the Chief's goals and objectives and the Chief was concerned that Fisher "was five, six years senior to me, five years or more – seven or eight years senior to Mike Morris, who was going to be his captain" and the Chief "told that he might have a problem with . . .  two people who were junior to him are now his bosses."  (Defs.' Ex. 31, "Catania Dep." Tr. 34:23 - 36:6)  However, the Chief said that in March of 2008, he learned that Fisher had been helpful on the police force and "realized that my concerns about him not being a hundred percent into my goals and objectives . .

_____

[11] Risley, McCullough, Carman, and Hodson each ranked Tavarez fourth out of the five candidates.  (Defs.' Ex. 50, "2008 Ranking Sheet of Risley"; Defs.' Ex. 51, "2008 Ranking Sheet of McCullough"; Defs.' Ex. 54, "2008 Ranking Sheet of Hodson")  Glassey ranked Tavarez last.  (Defs.' Ex. 52, "2008 Ranking Sheet of Glassey")  With regard to the 2008 round, Risley testified that "longevity" was "probably the biggest factor I guess that all of the township committee probably considered, but there was other factors as well . . .."  (Defs.' Ex. 30, "Risley Dep.," Tr. 43:4 – 43:8).  McCullough, who recommended Tavarez in 2007, said that he ranked candidates based on "the interview, based on experience as a police officer, and their positions in the department, but it had a lot to do with the interview that night."  (Defs.' Ex. 38, "McCullough Dep.," Tr. 87:1 – 87:4).  Carman said that during the 2008 interview, Tavarez "appeared to have a bit of an attitude."  (Defs.' Ex. 42, "Carman Dep.," Tr. 22:15 – 22:16)  Hodson testified that he ranked Fisher first because "I listened to his interview, I looked at his date of hire and his time as a Lieutenant, and that's how I voted."  (Defs.' Ex. 44, "Hodson Dep.," Tr. 101:6 – 101:8)  Glassey, who recommended Tavarez in 2007, testified that he thought Taverez would do well in the 2008 interview round "because now he had another year or so under his belt," but Glassey said that "was personally taken back at the second interview" because Tavarez "had an attitude."  (Defs.' Ex. 40, "Glassey Dep.," Tr. 27:13 – 27:20).

. and being concerned with those two people very junior to him all of a sudden being his bosses were kind of unfounded."  (Defs.' Ex. 31, "Catania Dep." Tr. 35:22 - 36:6)  Further, "at the same time," the Chief said that Tavarez "had a discipline issue that . . . concluded in November . . . and that bothered me."[12]  (Defs.' Ex. 31, "Catania Dep." Tr. 36:7 - 36:10)  Thus, Defendants argue that these are legitimate, non-discriminatory reasons for failing to promote Tavarez in 2008.

### The 2009 Promotion

There was one open position for Captain in 2009; the Chief did not affirmatively recommend any candidate, as the Chief's choice would have been Jay Woods, who elected not to pursue the Captain position; rather, the Chief presented a memorandum to the Township Committee, in which he weighed the qualifications of the candidates. (Defs.' Ex. 58, "Catania Memo Comparing 2009 Candidates")  The Township Committee interviewed James Druding, William Fair, John Townsend, and Tavarez during a Closed Session Meeting on January 12, 2009.  (Defs.' Ex. 32, "EHT's Answers to Plaintiff's Third Supplemental Interrogatories")  The Township Committee promoted William Fair.  (Defs.' Ex. 68, "Resolution No. 105 Promoting Lieutenant Fair to Captain").

Defendants argue that the Township Committee's "consensus following the 2009 interview process was that Fair had a better interview than Plaintiff," as "several members on the Committee commented that Plaintiff had a bad interview and had an

---

[12] The parties do not dispute this disciplinary issue; here, a written reprimand issued and signed off on by Tavarez indicates that on August 23, 2007, when Tavarez was visiting a Middle School while on duty and in uniform, he raised his voice which caused the principal and construction contractor to take notice.  (Pl. RSMF ¶¶ 192-96)  The reprimand cautions Plaintiff to refrain from conducting Police Athletic League business while on duty and indicates that that Tavarez's conduct "reflected adversely on this department and will not be tolerated."  (Pl. RSMF ¶¶ 192-96).

attitude."[13]  (Defs.' Mem. Supp. Summ. J. 25)  Defendants argue that Plaintiff did not

have the "sole recommendation" of the Chief, as the Chief presented the Committee with

a memorandum outlining the qualifications of the different candidates.[14]  (Defs.' Mem.

---

[13] The Township Committee members unanimously ranked Fair first.  (Defs.' Ex. 59, "Handwritten Meeting Notes")  Risley testified that he selected Fair over Tavarez in the 2009 round because of his "longevity" as well as "education" and "the evaluations"; Risley also testified that "Tavarez was certainly qualified . . . and so was Mr. Townsend" and the "only one that I thought was not ready was . . . Mr. Druding . . . he was just not ready yet for the position." (Defs.' Ex. 30, "Risley Dep.," Tr. 81:14 – 81:20).  McCullough considered "time of service," "length of time and experience with the department," "qualifications," and the candidates' responses to his questions in the interviews.  (Defs.' Ex. 38, "McCullough Dep.," Tr. 124:1 – 126:15)  McCullough said that "every candidate met the criteria" and "the interview really helped me make my decision."  (Defs.' Ex. 38, "McCullough Dep.," Tr. 124:1 – 126:15)  McCullough voted for Fair because of "his qualifications" and "he interviewed very well that night" whereas "[s]ome of the other candidates did not interview well," including Tavarez, who "wasn't on his game that night."  (Defs.' Ex. 38, "McCullough Dep.," Tr. 120:16 – 120:25)  Glassey testified that Tavarez never performed as well as he did in his first interview and he thought that Tavarez "was more cocky" and Glassey "wouldn't want to work under him with that attitude."  Glassey said that he "was hoping that each time Hector interviewed before me that I would see the old Hector, which was more of a happy-go-lucky guy instead of  -- he acted like a big shot."  (Defs.' Ex. 40, "Glassey Dep.," Tr. 51:23 – 52:11).  Carman said that "specifics are hard to recall, but I do remember in the second and third rounds, that Hector did seem to have a little bit of an attitude."  (Defs.' Ex. 42, "Carman Dep.," Tr. 35:3 – 35:22)  Hodson testified that Fair was a superior candidate to Tavarez because Fair "has been on five years longer[,] Hector makes Lieutenant a year before him, Fair has a Master's, Hector has a Bachelor['s]."  (Defs.' Ex. 44, "Hodson Dep.," Tr. 41:21 – 41:25).

[14] The Chief's memorandum indicates that the Chief believed that two of the candidates were not ready for the Captain position.  (Defs.' Ex. 58, "Catania Memo Comparing 2009 Candidates")  With regard to William Fair, who received the promotion, Chief Catania's memo noted:

> Senior on pd, very good admin skills, details, deadlins.  Sometimes trouble dealing with people – speaking to them, let Lt. Woods down when Capt. Morris was away.  More of a company guy, his focus.  Recently swapped with Tavarez – in OPR now.  Well rounded, Good fit.

(Defs.' Ex. 58, "Catania Memo Comparing 2009 Candidates")  With regard to Hector Tavarez, the Chief wrote:

> Senior Lt. CALEA accomplishment, improved a lot since early 2007, brings a lot to the community, but has some issues as well. Capt's feel that he is under invested in dept.  I agree.  Has a lot going on.  Last few weeks has been effective with his new patrol squad.  Needs to soften his approach in Services – dealing with citizens.  Issue PAL – address it in his interview – give it up or not – spoke to him about it, did not ask for his answer.  Will tonight.

Supp. Summ. J. 26)  Further, Defendants note that Fair "had more overall time in the Department" as well as a Master's Degree, while Plaintiff had a Bachelor's Degree. (Defs.' Mem. Supp. Summ. J. 26).  Thus, Defendants argue that these are legitimate, non-discriminatory reasons for failing to promote Tavarez in 2009.

### ii.  Pretext

Following Defendants' articulation of some legitimate, non-discriminatory reason for rejecting Tavarez, the burden shifts back to him to demonstrate that the Defendants' proffered reasons are merely pretextual for discrimination by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Fuentes, 32 F.3d at 765 (internal citations omitted).

Tavarez argues that Defendants' proffered legitimate, non-discriminatory reasons are merely pretext.  First, he argues that the Court should view the evidence in the record as "cumulative evidence of discrimination" and not "three separate instances of failure to promote."[15]  (Pl. Br. Opp'n. 6).

_____

(Defs.' Ex. 58, "Catania Memo Comparing 2009 Candidates")  In response to the concern that Tavarez's commitment to the Police Athletic League would prohibit him from devoting his full attention to a position as Captain, Tavarez presented a memo to the Township Committee indicating that he would resign as the Executive Director of the Police Athletic League if promoted; however, Deputy Clerk Olga Perez, who was a the meeting, remembers Plaintiff "specifically saying that he could do both jobs."  (Defs.' Ex. 55, "Perez Dep." Tr. 87:7 – 88:18).

[15] At this juncture, the Court wants to make clear that while it  will look at all of the evidence together and in the light most favorable to Plaintiff, each failure to promote is a discrete act and each adverse employment decision constitutes a separate actionable employment decision.  See, e.g. Schottanes v. Borough Of N. Haledon, 343 Fed. Appx. 771, 774 (3d Cir. 2009) (citing Cowell v. Palmer Twp., 263 F.3d 286, 293 (3d Cir. 2001)) (noting that "the failure to promote does not constitute a series of 'continual unlawful acts' but rather the 'continual ill effects from [the]

Second, Tavarez argues that the record contains evidence of racial animus by at least one Defendant, Paul Hodson, who voted against Tavarez in each of the promotional rounds at issue.  (Pl. Br. Opp'n. 6)  Specifically, Sergeant Michael Hughes testified that, approximately four weeks after the 2009 vote, when responding to a disturbance during a "ride along," Hodson allegedly said, "It's just a bunch of Niggers being Niggers."  (Defs.' Ex. 60, "Hughes Dep.," Tr. 25:3-16).  Tavarez argues that this statement is "overtly racist" and "a fact-finder could consider it in judging Hodson's motives for the promotional decisions at issue."  (Pl. Br. Opp'n. 7-8)  Tavarez further argues that while he "does not identify as African American *per se* he is dark skinned for much of the year, and has been called 'the N word' at various times since his youth" which he finds "upsetting."  (Pl. Br. Opp'n. 9)  Further, Tavarez urges the Court to follow Ramirez v. UPS, CIV.A.06-1042, 2010 WL 1994800 (D.N.J. May 17, 2010), in which the Court permitted evidence of derogatory comments directed at African Americans in a case with a Hispanic Plaintiff.

Defendants assert that Hodson has denied making the comment.  (Defs.' Ex. 44, "Hodson Dep.," Tr. 112:22 – 113:5)  Moreover, Defendants note that in the Ramirez case, the Plaintiff testified that "he had 'black Hispanic' ancestors and Plaintiff also described an exchange he had with a co-worker in 1996 where he told the coworker that a particular joke targeting African-Americans was offensive because he had black

original violation,' which is insufficient to create a continuing violation'"); Robinson v. Home Depot, Inc., CIV. A. 06-935MLC, 2009 WL 2960990 (D.N.J. Sept. 11, 2009) (noting that "[f]ailure to promote is a discrete act and each incident of discrimination and retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice for which the limitations on filing individually applies").  Accordingly, the Court acknowledges Plaintiff's arguments regarding the aggregate impact of its evidence and will consider this evidence surrounding each of the three promotional decisions at issue; however, it will not consider the failure to promote claims as one continual unlawful act.

ancestry." See Ramirez, 2010 WL 1994800, at *3.  Accordingly, the Ramirez Court noted that "Plaintiff's testimony, thus, reveals that Plaintiff considers himself to also be black."  Id.  The Ramirez Court noted that evidence of "discrimination against persons of different races or national origin than Plaintiff will not be admissible.  There must be a causal nexus between the discriminatory conduct and Plaintiff's Hispanic and black racial background."  Id.  In contrast, here, Defendants argue that "Plaintiff's seasonal change in complexion and his distaste for the N Word does not allow Plaintiff a legally cognizable protected status as an African American."  (Defs. Reply 10).  Defendants also rely on Fuentes v. Perskie, in which the Third Circuit compared the underlying case to Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992), and quoted Ezold to note that "stray remarks by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  32 F.3d 759, 767 (3d Cir. 1994) (internal quotation omitted).  Here, Defendants argue that the comment cannot be used to show pretext, as it was an unrelated "stray remark" because the "ride along" occurred four weeks after the 2009 promotional vote, was not made toward or about Tavarez, was not made in Tavarez's presence, and the comment was not related to the promotional process.  (Defs.' Reply 8)  See also, e.g., Jackson v. Chubb Corp., Civ. No. 98-4361, 2001 U.S. Dist. LEXIS 4684 (D.N.J. March 21, 2001) (finding that Plaintiff did not make a showing of pretext based on allegations of racist jokes that were not observed by Plaintiff or linked to the allegedly adverse employment decisions).

Third, Tavarez argues that the evidence shows that "the only reason Tavarez was not promoted to captain was that he was Hispanic" because Tavarez was, "by any

objective standard," the "most qualified" candidate.  (Pl. Br. Opp'n. 10)  He argues that

Defendants "manipulated their definition of 'seniority'" and used a "highly subjective"

interview process that allows Committee members to advance "vague" and "unprovable"

generalities about 'attitude' and 'appearance' as reasons for choosing one candidate over

another."  (Pl. Br. Opp'n. 6, 10)  He argues that this promotional process "provides the

prefect architecture for pretextual decision-making."  (Pl. Br. Opp'n. 10)  Further,

Tavarez argues that the Township changed its promotional practice by requiring

competitive interviews before the entire Township Committee when he began to seek

promotion in 2007; Tavarez argues that prior to 2007, the practice was "to rely on the

written report and recommendation of the chief of police" and did not include "highly

subjective" competitive interviews before the entire five-person Township Committee.

(Pl. Br. Opp'n. 10-11)  Tavarez argues that this alleged policy change supports "an

inference that the defendants revised their promotional procedures to prevent a

Hispanic from becoming police captain – and, presumably, eventually chief of police."

(Pl. Br. Opp'n. 11-12).

        In response, Defendants first argue that the Township Committee did not always

follow the Chief's recommendation, as in 2001, the Township Committee appointed

John DeAngelis, an individual not recommended by the Chief.  (Defs.' Reply 5; Defs.' Ex.

31, "Catania Dep," Tr. 66:11 - 67:18)  Further, Defendants argue that the Township

Administrator Peter Miller admits to a change in policy, but that this change occurred in

the late 1990s; specifically, interviews used to be conducted by a subcommittee,

consisting of three members of the Township Committee, the municipal administrator,

and the Chief of Police, as set forth in the Township Code.  (Defs.' Ex. 28, "Miller Dep."

Tr. 42:13 – 45:25)  Miller indicates that in the late 1990s, all five members of Township

Committee became included in the process because of "a change in leadership in the Police Department," as the governing body at the time "said that we want to be involved in all police selection, interview, appointment process from start to finish, because only two of them were excluded from the subcommittee, and the other two were saying why are you leaving us out, we want to be included in the process." (Defs.' Ex. 28, "Miller Dep." Tr. 42:13 – 45:25).

Fourth, Tavarez argues that the record demonstrates that "the township has done a poor job of recruiting and promoting minorities, both generally and in the police department." (Pl. Br. Opp'n. 12) From 1986 to 2011, Tavarez was the only Hispanic member of the police department. (Defs.' Resp. to Pl. CSMF ¶ 56). Defendants point out that the police department hired a Hispanic officer after Tavarez retired.[16] (Defs.' Resp. to Pl. CSMF ¶ 56).

Tavarez argues that Defendants used "inflated hiring and employment demographic statistics as a pretext for concealing the effects of their discriminatory practices." (Pl. Br. Opp'n. 12) Defendants admit to a discrepancy in their statistical information, as they became aware "after receipt of Plaintiff's Opposition Brief that the EEO forms it had obtained from the Township were not the complete official forms that

---

[16] Tavarez also challenges Defendants' contention that they were certified by the Commission on Accreditation for Law Enforcement Agencies ("CALEA"), which requires compliance with non-discrimination practice. Tavarez cites an email exchange between his investigator and a deputy director at CALEA to argue that "what CALEA recognition EHT ever had expired in 2007" and "[n]o further recognition or accreditation of Egg Harbor Township was ever given by CALEA." (Pl. RSMF ¶ 55; A169-173) Defendants assert that they were certified by CALEA and, citing an affidavit of a CALEA Assessor, that the New Jersey State Association of Chiefs of Police (NJSACOP) partnered with CALEA and adopted the core CALEA standards as the New Jersey Law Enforcement Accreditation Standards; this program is known as the CALEA Recognition Through Alliance Program. (Defs.' Resp. Pl. CSMF ¶ 55) (citing Defs.' Ex. 101, "Miller Affidavit") Mr. Rogers' affidavit indicates that Egg Harbor Township is one of the seventy five police departments in New Jersey to be accredited through this Recognition Through Alliance process. (Defs.' Ex. 101, "Miller Affidavit" ¶ 19).

had been filed with the EEOC," because of a filing error in 2009 by a Clerk "who was new to the finance office in 2009." (Defs.' Reply 10-11). Accordingly, Defendants submitted new statistical information, which they argue still reflect "a continuing steady march toward a more diverse workforce."[17] (Defs.' Reply 11) (citing Defs.' Ex. 108, "Supplemental Report of Richard W. Deaney & Charts")). Accordingly, Plaintiff's arguments on this point reflect Defendants previously-submitted statistical evidence, which Defendants concede is inaccurate.

Tavarez also argues that the testimony of Olga Perez, the Deputy Township Clerk, creates "a strong inference of institutional racial discrimination." Ms. Perez said that there were only two instances where Township employees were denied promotions on multiple applications — both herself and Tavarez, who are both Hispanic. Further, the Township declined to pay for Perez's certification or training for the positions that she sought, while the Township paid for the certification of her white counterparts. (Pl. Br. Opp'n. 14-15) In response, while Perez could only recall two instances in which employees were denied promotions on multiple occasions, Defendants point to James Druding, a Caucasian male, who was not promoted to Captain until his fourth time applying. (Defs.' Reply 13) Further, Defendants contend that Ms. Perez did not have

---

[17] Through their supplemental submissions, Defendants contend that between 1999 and 2009 the percentage of non-white employees (full time and other than full time) more than doubled, as it increased from 5.6% in 1999 to 12.2% in 2009; the number of non-white employees in 1999 was 10 out of 180 and in 2009 the number of non-white employees was 47 of a total of 386. (Defs.' Reply 12) (citing Defs.' Ex. 108, "Supplemental Report of Richard W. Deaney & Charts")). Between 1999 and 2009, 9 of 80 full time employees hired were non-white and 4 of the 9 non-white employees hired were Hispanic. (Defs.' Reply 12) (citing Defs.' Ex. 108, "Supplemental Report of Richard W. Deaney & Charts")). During this decade, the number of white full time employees increased from 164 to 215 (31.1%); the number of full-time non-white employees increased from 9 to 19 (111.1%). (Defs.' Reply 12) (citing Defs.' Ex. 108, "Supplemental Report of Richard W. Deaney & Charts")).

her personnel file during her deposition and there is no record of Perez applying for the positions that she alleges seeking; rather, Defendants submitted an Affidavit from Township Administrator Peter Miller along with documents from Ms. Perez's personnel file to support their argument that she inquired about several positions, but did not apply for these positions.  (Defs.' Reply 13) (citing Defs.' Ex. 104 "Attachments to the Affidavit of Peter Miller")  Defendants also argue that the Township pays for training classes "that are directly related to one's current employment with the Township" and Ms. Perez was not reimbursed because her courses were "only related to her future goals and ambitions."  (Defs.' Reply 15) (citing Defs.' Ex. 104 "Attachments to the Affidavit of Peter Miller")  Accordingly, Defendants argue that "the evidence actually shows that Perez received a promotion in the one instance where she applied and maintained her application for promotion."  (Defs.' Reply 13) (citing Defs.' Ex. 104 "Attachments to the Affidavit of Peter Miller").

Finally, Tavarez argues that the evidence shows that the individual defendants were personally involved as they participated in "altering or revising the township's promotion process to avoid giving a captaincy to Tavarez."  (Pl. Br. Opp'n. 16).

## IV.   Analysis

The Court finds that Defendants have offered legitimate, non-discriminatory reasons for failing to promote Tavarez in their 2007, 2008, and 2009 promotional decisions. Here, it is undisputed that Tavarez was qualified for the position in each of the promotional rounds at issue.  However, the Township Committee contends that they promoted other candidates over Tavarez after considering non-discriminatory factors such as Tavarez's inexperience as a Lieutenant, the quality of his interview, the recommendation of the Chief, and his workplace history and background compared to

the other candidates.  The Court finds that Defendants have met their burden of

production for each promotional round at issue, as they have introduced "evidence

which, taken as true, would permit the conclusion that there was a nondiscriminatory

reason for the unfavorable employment decision."[18]  See Fuentes, 32 F.3d at 763.

Here, Tavarez has failed to demonstrate that Defendants' proffered legitimate

reasons were merely pretext for discrimination.  Notwithstanding Tavarez's arguments

advanced both in his written submissions as well as during oral argument, and

considering all of his evidence together and in the light most favorable to him, he has

failed to "point to some evidence, direct or circumstantial, from which a factfinder could

reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2)

believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action."  Id. at 764.  Specifically, Tavarez argues

that race discrimination can be inferred based on cumulative evidence of Egg Harbor

Township's failure to promote him on three separate occasions, the racial animus of one

Committee member who allegedly made a racist comment directed toward African

Americans, Tavarez's belief that he was the most qualified candidate in each round and

that Egg Harbor Township changed their promotional practices to prevent a Hispanic

from becoming Captain and eventually Chief of Police, and the lack of diversity among

the police force and Township employees generally; however, these arguments do not

---

[18] Here, courts have accepted these proffered reasons as legitimate, non-discriminatory reasons
for an employer's decision.  See, e.g., Green v. Postmaster Gen. of U.S., 437 Fed. Appx. 174, 177
(3d Cir. 2011) (finding that employer carried his burden when explaining that he did not
promote the Plaintiff because the other candidate "vastly outperformed" Plaintiff in the
interview); Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (finding that the Plaintiff did not
succeed "in throwing enough doubt on any of [the Commissions] explanations so that a rational
factfinder could reject" the Commission's reasons for electing to hire another candidate who the
Commission felt was better qualified than Plaintiff).

show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons" to enable Plaintiff to survive Defendants' Motion for Summary Judgment.[19] Id. at 765 (internal citations omitted).

The Court's role in deciding this Motion is not to question Egg Harbor Township's promotional standards. See, e.g. Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 527 (3d Cir. 1992) (explaining the Court's "cautions against [the Court's] "unwarranted invasion or intrusion" into matters involving professional judgments about an employee's qualifications for promotion within a profession" and holding that the District Court erred when it evaluated and disagreed with the promotional standards at issue, in contrast to an assessment of whether the employer applied those standards

---

[19] Here, the Court finds that the discrepancies regarding the Township of Egg Harbor's CALEA status, the discrepancies in the parties' submissions of EEOC statistics, and the arguments surrounding Olga Perez as evidence of institutional race discrimination do not create inconsistencies that would preclude a grant of Summary Judgment in Defendants' favor. Specifically, viewing the evidence in a light most favorable to the Plaintiff, even if the Township was not certified by CALEA, and if the corrected statistics do not reflect as great a Township-wide trend toward diversity as Defendants originally reported, this evidence, even when viewed with Plaintiff's other evidence and arguments, does not cast such doubt on the Defendants' proffered legitimate, non-discriminatory reasons such that a reasonable factfinder could rationally find these proffered reasons unworthy of credence and infer that the Township failed to promote Tavarez because of his Hispanic race. See Dooley v. Roche Lab Inc., 275 Fed. Appx. 162, 165 (3d Cir. 2008) (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 542-543 (3d Cir.1992)) (noting that while "[s]tatistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext," we have explained that conclusions cannot fairly be drawn from "raw numerical comparisons" in the absence of "analysis of either the qualified applicant pool or the flow of qualified candidates over a relevant time period."). Further, while Plaintiff offers the testimony of Ms. Perez as evidence of institutional race discrimination, the Court acknowledges Defendants corrections to the factual inaccuracies in her testimony, as described above. Moreover, when asked about whether she has personally experienced discrimination in Egg Harbor Township, she replied, "not racially" and that she feels that she has "probably" experienced "gender discrimination." (Defs.' Ex. 55, "Perez Dep.," Tr. 20:22 – 21:16).

equally); Gray v. R.J. Reynolds Tobacco Co., No. 09-3788, 2011 WL 114868 (D.N.J. Jan.

13, 2011) (noting that "it is not for the Court to second guess the methods Defendants

used to evaluate their employees").  Accordingly, the Court recognizes that "an employer

has discretion to choose among equally qualified candidates, provided the decision is

not based upon unlawful criteria," Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S.

248, 259, 101 S. Ct. 1089, 1097, 67 L. Ed. 2d 207 (1981), and to discredit Defendants'

proffered reasons, Tavarez "cannot simply show that the employer's decision was wrong

or mistaken, since the factual dispute at issue is whether discriminatory animus

motivated the employer, not whether the employer is wise, shrewd, prudent, or

competent." Fuentes, 32 F.3d at 765.

    Tavarez's speculations about his qualifications and the promotional process do not

demonstrate that the Defendants' proffered reasons were merely pretext.  While Tavarez

is not required to "adduce evidence directly contradicting the defendant's proffered

legitimate reasons," he is required to offer enough evidence such that a factfinder could

reasonably infer that each of defendants' proffered non-discriminatory reasons "was

either a *post hoc* fabrication or otherwise did not actually motivate the employment

action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Tavarez's opinion that he

was "by any objective standard" the most qualified candidate and should have received

the promotion does not cast sufficient doubt on Defendants' evidence, which, as

described in detail above, demonstrates several legitimate and non-discriminatory

reasons for the Township Committee's preference for other candidates over him during

each of the promotional rounds.  Tavarez's speculation about his qualifications is not

enough to survive Defendants' Motion for Summary Judgment.  Similarly, Tavarez's

speculation that the Township Committee changed their hiring practices to prevent him

from becoming Captain is not sufficient to defeat Defendants' Motion for Summary

Judgment.[20]  See Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995)

(noting that "a plaintiff cannot resist a properly supported motion for summary

judgment merely by restating the allegations of his complaint, but must point to

concrete evidence in the record that supports each and every essential element of his

case"); Chambers v. Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *4

(D.N.J.) ("Speculations, generalities, and gut feelings, however genuine, do not allow for

an inference of discrimination to be drawn when they are not supported by specific

facts.").  Notwithstanding Plaintiff's contentions, the Court cannot deny Defendants'

Motion for Summary Judgment, as Plaintiff has failed to offer more than speculation as

to Defendants allegedly discriminatory promotional practices.

---

[20] Tavarez's speculation that Defendants manipulated their promotional practice to prohibit him from becoming Captain is countered by Defendants' evidence that the Township Committee did not always follow the Chief's recommendation, as evidenced by the promotion of John DeAngelis in 2001.  (Defs.' Ex. 31, "Catania Dep," Tr. 66:11 - 67:18) Further, while Tavarez argues, citing to Chief Catania's deposition testimony, that "[t]he change is confirmed by Police Chief Blaze Catania," Mr. Catania's deposition testimony actually states that prior to 2007, he "wouldn't know whether the committee brought people over to interview or not" and that he does not know "if any captains positions were open during that difference of time frame [between 1999 and 2007]" and that when he became chief in December 2006 an interview process occurred with the Township Committee.  (Defs.' Ex. 31, "Catania Dep," Tr. 52:11 - 52:23, 56:04 – 58:17).  Defendants' offered evidence, through the deposition testimony of Township Administrator Peter Miller, that starting in the late 1990s, all five members of the Township Committee became involved in the interview process, as opposed to the three-member subcommittee interviews that occurred previously.  (Defs.' Ex. 28, "Miller Dep." Tr. 42:13 – 45:25)  Accordingly, Tavarez's speculation that Defendants changed their policy to prevent him, a Hispanic male, from becoming Captain does not cast sufficient doubt on Defendants' evidence and proffered reasons for their promotional decisions in this case.

## V.    Conclusion

Accordingly, for the foregoing reasons, the Court will **__grant__** Defendants' Motion for

Summary Judgment [Dkt. 64].  The appropriate Order shall issue.


Dated:  March 25, 2013


                                        _/s/ Joseph H. Rodriguez
                                        Hon. Joseph H. Rodriguez
                                        UNITED STATES DISTRICT JUDGE